Filed 6/18/26  Cepeda v. Sweet Fish Sushi Bar CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| LENY CEPEDA et al., | B341841 |
| Plaintiffs and Respondents, | (Los Angeles County Super. Ct. No. 19STCV19479) |
| v. | |
| SWEET FISH SUSHI BAR, INC., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Jill T. Feeney, Judge.  Affirmed.

Beitchman & Zekian, David P. Beitchman and Paul Tokar for Defendant and Appellant.

Employee Justice Legal Group, Kaveh S. Elihu and Daniel J. Friedman for Plaintiffs and Respondents.

\* \* \* \* \* \*

Sweet Fish Sushi Bar, Inc. (Sweet Fish) appeals from an order denying its motion for judgment notwithstanding the verdict (JNOV motion) pursuant to Code of Civil Procedure section 629.[1]  Sweet Fish filed the motion following a jury trial of employment-related claims brought by respondents Leny Cepeda, Lizette Coronado, and Marcel Tillman (collectively respondents).  The trial court denied the JNOV motion by operation of law.  For the reasons set forth below, we affirm the order.

## FACTUAL BACKGROUND

### Respondents' employment

Cepeda was hired to bus tables at Sweet Fish on April 1, 2017.  He heard about the job from Coronado, who was employed at Sweet Fish and was Cepeda's romantic partner.  Within one to two months of being hired, Cepeda was promoted to assistant manager with a pay increase from minimum wage to $15 per hour.

Coronado had been working at Sweet Fish since spring 2016 as a server.  She was later promoted to closing shift supervisor.

In June 2017, General Manager Josue Soriano asked Coronado if she knew any good workers, as Sweet Fish was short-staffed.  Coronado suggested Tillman, a friend she had known for several years who had prior experience working as a server at a different restaurant.  Tillman is a Black man.  Soriano approved Tillman's hiring and instructed Coronado to start training him.  The training began around June 10, 2017, and lasted approximately five days, with each shift running from four to six hours.  By June 15, 2017, Tillman had completed training and was being scheduled for work shifts.

---

[1]	All further undesignated statutory references are to the Code of Civil Procedure.

On June 15, 2017, during the evening shift that Cepeda was working, Al Watson, the owner of Sweet Fish, entered the restaurant. Cepeda testified Watson was "furious," and, referring to Tillman, said to Cepeda: "I don't want him here. I don't want him here. I don't want him here. I want to be served by beautiful Asian women. That's what my partners like to get served by." At the time Watson made this statement to Cepeda, Cepeda was standing in the area between the prep room and the sushi bar.

Cepeda testified he responded to Watson, "this doesn't make sense. So you prefer to have people working here because of their looks instead of because of their work performance or their work ethics." Watson repeated he did not want Tillman there, and "just stormed out."

Coronado was also present at Sweet Fish the evening of June 15, 2017. She witnessed Watson entering the restaurant, "marching towards the back of the restaurant" and speaking to Cepeda "very angrily."

Tillman was also present at Sweet Fish on June 15, 2017. He saw Watson go past him to the back where Cepeda was working. Tillman observed Cepeda and Watson look at him but he did not hear anything that was said between the two of them because both music and a television were playing.

At the end of the night, Coronado asked Cepeda what happened between him and Watson and what they had talked about. Cepeda repeated Watson's words to Coronado that he did not want Tillman there and only wanted beautiful Asian women to serve his customers. Cepeda also told Coronado he was confused and shocked because Watson appeared not to care about an individual's work ethic, but only cared about their looks.

**Tillman's termination**

Tillman finished his shift that night. He was later made aware of the conversation between Cepeda and Watson. He was told to come in early the next day because Watson and Glen

Murphy, one of the supervisors at Sweet Fish, wanted to speak with him.

When Tillman arrived the following day, he was informed the meeting was not happening. Instead, Soriano walked up to Tillman and gave him a check. Soriano told Tillman he was sorry, but Sweet Fish was not moving forward with Tillman's employment. Tillman never met with Watson or Murphy. Tillman understood he was terminated because he was not a beautiful Asian woman.

**Cepeda's testimony regarding retaliation and termination**

Cepeda testified that after the June 15, 2017 incident, he complained to Soriano "many times" about what Watson had said regarding Tillman. Following these complaints, Cepeda's shifts as a server, where he could earn tips, were cut. Cepeda testified he confronted management about these actions and was informed it was necessary to maintain "sales versus labor" ratios. Cepeda observed no other employees having their hours cut in this way.

On December 11, 2017, a managers' meeting was scheduled. Cepeda was the only manager not invited to attend the meeting. Cepeda became aware of the meeting and sent an e-mail asking if he needed to attend. He received no response.

Prior to the June 2017 incident, Cepeda had received no written warnings from his employer. After the incident and his complaints, however, he received two written warnings. The first was for not attending one of the managers' meetings. Cepeda disputed the warning, because he had spoken to Soriano by phone prior to the meeting and informed Soriano that he would miss the meeting. Soriano said it was fine. Cepeda told Soriano it was not right and was done because Cepeda and Coronado had complained about discrimination against Tillman.

The second written warning was for leaving the restaurant in poor condition. Cepeda did not agree with this warning either, as the restaurant was short-staffed at the time, and Cepeda was doing the duties of three people. He was managing, serving, and

4

dishwashing.  At the end of the shift, Cepeda left notes saying a few dishes might need to be cleaned.  Cepeda again complained to Soriano, saying he thought he was being written up because he and Coronado "called you guys out" on discrimination against Tillman.  Soriano said it was not up to him but was vague about who issued the written warning.

Cepeda was terminated from employment at Sweet Fish on January 11, 2018.  Soriano called Cepeda to his office and gave him a termination letter.  Since Soriano told Cepeda he would not receive his last paycheck if he did not sign the termination letter, Cepeda signed the letter.  The reason given for Cepeda's termination was that Sweet Fish received a "B" on its health code inspection.  Cepeda, who was not present when the health inspection took place, had never been trained for any of the things cited by the Health Department during the inspection.  Cepeda believed he was terminated in retaliation for his opposition to the discrimination against Tillman.

**Coronado's testimony regarding retaliation**

Following Tillman's termination, Coronado confronted Watson about his statement to Cepeda regarding Tillman, telling him she felt discriminated against because she was Mexican, not Asian.  Watson denied making the statement and called Cepeda a liar.

Coronado testified her shifts changed dramatically after the incident in June 2017.  Before then, she worked both server shifts, where she would receive tips, and closing supervisor shifts.  After June 2017, she primarily received only closing supervisor shifts, for which she could not receive tips.  Coronado testified prior to the June 2017 incident she had been working full-time during the week and following the incident her schedule was cut to one lunch shift during the week.

Coronado complained verbally and via text to Soriano about her server shifts being cut, but she was brushed off and told he was not the one making the rules.

A few weeks after the incident with Tillman, Soriano informed Coronado that Watson made a rule that Coronado and Cepeda could not work together. Coronado testified Sweet Fish "forbade" her and Cepeda from working together, though it was well-known they were a cohabitating couple that commuted to work together.

After the instigation of the rule forbidding Coronado and Cepeda from working together, Soriano informed Coronado he was going on vacation for a few days with another employee of Sweet Fish. Soriano asked Coronado to cover a shift for him during his absence. Cepeda was also scheduled to work that shift. Coronado reminded Soriano there was a rule forbidding Coronado and Cepeda from working together. Soriano said it was fine, they could work together. During Soriano's absence, Coronado worked the shift with Cepeda. Later, Coronado was suspended for two weeks because she worked a shift with Cepeda. Coronado told Soriano, "this feels like a setup. Why did you make me work with him, and now you're punishing me for it?" Soriano brushed her off, saying the punishment was not coming from him. Prior to her suspension Coronado had never received any written warning or discipline.

Soriano testified Coronado was suspended for two weeks because she was "taking advantage of the schedule, sending people home earlier." According to Soriano, some servers were complaining that both Cepeda and Coronado were sending people home early "to get more chance to get more tables. When they get more tables, they get more tips." Soriano testified Murphy gave the suspension order, and Murphy had authority to give the suspension order without Watson's approval.[2] Watson also

---

[2]    Soriano did not recall taking a vacation that required Coronado and Cepeda to work together and did not believe any vacation of his had anything to do with the suspension. He claimed the suspension was based solely on schedule manipulation.

testified Cepeda and Coronado were "sending people home early and affecting the lives of other wait staff. When it was busy, they were taking all the tables."

Coronado testified she left Sweet Fish in December 2017 because she had not been getting enough shifts and could not live on her pay. There was also evidence Coronado had been suffering from a "cumulative injury, severe physical injury" since April 20, 2016, that she did not disclose to any of her coworkers or managers at Sweet Fish. This cumulative trauma injury was worsening as time went on, and Coronado was placed on full disability with a workers compensation claim shortly after October 2017. Coronado resigned from Sweet Fish in December 2017.

In March 2018 after Coronado was taken off full disability and put on restrictive work, she texted Soriano asking to return to work.

**Testimony of Watson**

Watson testified he had no opportunity to meet Tillman and never did so. When asked if he fired Tillman because he was African-American, Watson responded, "No." Watson also denied firing Tillman because of his sexual orientation. Watson confirmed his managers had authority to suspend and terminate employees, and he would follow their recommendations if they gave him reasons.

When asked at trial about whether he said he wanted more Asian servers in June 2017, Watson said it did not matter to him. However, Watson's prior deposition was read at trial where he answered that question: "Yeah. Wouldn't you?" Watson testified regarding a conversation he had with Coronado, "If you go to a Mexican restaurant, a Hispanic restaurant, and you see nothing but white people cooking and working, do you assume it's an authentic Mexican restaurant[?] So I said we probably have to get a better mixture now."

Watson testified Cepeda and Coronado were sending other employees home early so they could take more tables, adding he would walk in during the busy times, see Coronado and sometimes Cepeda, and say, "where is the other wait staff?" Watson characterized this behavior as theft, saying he believed Coronado and Cepeda were cutting other people's shifts to pad their own pockets. Other wait staff complained to Watson about Coronado and Cepeda's behavior. Watson confirmed he authorized Cepeda's termination based on this behavior.

Watson recalled ordering that Cepeda and Coronado could not work together. At trial, he said it was due to their work performance. However, in his deposition that was read at trial, he said he did not know whether Cepeda's and Coronado's work performance suffered due to their relationship.

As to Coronado, Watson testified his managers were in charge of her two-week suspension. He could not recall the reason Coronado was suspended, although he was probably informed at the time. He was not aware of any specific warnings to Coronado other than the suspension discussed.

## PROCEDURAL HISTORY

**Relevant jury instructions**

Following trial, the court instructed the jury as to the law, including the following instructions:

Instruction No. 2505, as to Leny Cepeda and Lizette Coronado, for "Retaliation—Essential Factual Elements (Gov. Code, § 12940(h))."

Instruction No. 2527, as to Leny Cepeda, Lizette Coronado, and Marcel[] Tillman for "Failure to Prevent Discrimination or Retaliation—Essential Factual Elements—Employer or Entity Defendant (Gov. Code, § 12940(k))."[3]

---

[3] Instruction No. 2527 specified one of the required elements as: "That Leny Cepeda, Lizette Coronado, and/or Marcel[] Tillman were subjected to discrimination or retaliation in the

8

Instruction No. 4603, as to Lizette Coronado, for "Whistleblower Protection—Essential Factual Elements (Lab. Code, § 1102.5)," and instruction No. 3946, which set forth the requirements for an award of punitive damages.

**Special verdict, phase I**

On May 13, 2024, the parties and the trial court discussed the special verdict form and jury instructions outside the presence of the jury. Counsel for Sweet Fish posed some objections to the special verdict form, particularly the way it "flow[ed]." Sweet Fish's counsel was concerned that Tillman's claims of wrongful termination should be addressed first on the form, because "it flows a lot better." In response to Sweet Fish's comments, the court stated: "You all need to now look at this to say what comes out. [¶] So why don't you all sit, and you can sit right here, fix the jury form, and you can email it to me or email it to Madam Clerk in Word format. She'll print it out for me, and we'll take a look at it. [¶] But you all meet and confer right now and figure out how to fix it. And please triple-check it in terms of accuracy."[4]

Following a recess, outside the presence of the jury, the trial court stated, "So now I have a special verdict form with handwriting on this, and I'll put on the cover Phase I.… So this is—it appears to be joint. I don't intend to review it. [¶] I

_____

course of their employment," and that Sweet Fish failed to take all reasonable steps to prevent that retaliation or discrimination.

[4] Respondents assert, without citation to the record, that on April 26, 2024, respondents served and filed a proposed general verdict form that included a series of special questions regarding punitive damages. Sweet Fish had objected to the general verdict form, alleging its questions regarding punitive damages were too complicated and would confuse the jury. Instead, Sweet Fish proposed using the two special verdict forms that were eventually presented to the jury. We decline to consider this information, as respondents have failed to provide citations to the record supporting these assertions.

guess—have you all looked over this carefully and checked every decision tree, checked every number to ensure that this is accurate and what everyone wants?" Counsel for both Sweet Fish and respondents answered affirmatively.

The court then reviewed the jury instructions with counsel.

Following their being instructed by the court, the jury found Sweet Fish subjected Cepeda to an adverse employment action, but Cepeda's race, color, association with a protected member of a protected class, and/or engagement in protected activity was not a substantial motivating reason in the adverse employment action against Cepeda.

The jury also found Sweet Fish subjected Coronado to an adverse employment action, but Coronado's race, color, association with a protected member of a protected class, and/or engagement in protected activity was not a substantial motivating reason in the adverse employment action against her.

Similarly, as to Tillman, the jury found Sweet Fish subjected him to an adverse employment action, but Tillman's race, sex, association with a protected member of a protected class and/or engagement in protected activity was not a substantial motivating reason in the adverse action against Tillman.

In spite of the above findings, the jury found Sweet Fish did not take reasonable steps to prevent retaliation and/or discrimination. The jury found this failure to prevent retaliation and/or discrimination resulted in harm to Cepeda and Coronado, but not Tillman. They awarded Cepeda $20,000 in damages for past noneconomic loss and awarded Coronado $15,000 in damages for past noneconomic loss.

The jury found Sweet Fish discharged both Cepeda and Tillman, but those individuals' race, color, gender, association with a protected member of a protected class, and/or engagement in protected activity was not a substantial motivating reason in their respective discharges.

The jury found in favor of Coronado on her claim for whistleblower protection. Specifically, they found Coronado was employed by Sweet Fish, had disclosed to a person with authority over her that Sweet Fish discriminated against another individual, had reasonable cause to believe that the information disclosed a violation of a state or federal statute, that Sweet Fish subsequently subjected Coronado to an adverse employment action, and that Coronado's protected communication was a contributing factor in Sweet Fish's decision to subject her to the adverse employment action. The jury awarded Coronado $15,000 for past noneconomic loss in connection with her whistleblower claim.

The jury also found Sweet Fish engaged in conduct with malice, oppression or fraud against Cepeda and Coronado, but not Tillman.

Finally, the jury found in favor of Cepeda, Coronado and Tillman on their claims based on Sweet Fish's failure to permit them to inspect and receive copies of their personnel and payroll records.

**Special verdict, phase II**

In phase II, the jury was asked what amount of punitive damages, if any, it awarded against Sweet Fish. The jury awarded $5,000 to Cepeda and $5,000 to Coronado.

**JNOV motion**

On June 20, 2024, Sweet Fish filed its JNOV motion pursuant to section 629 along with a supporting memorandum of points and authorities. Sweet Fish argued (1) the jury verdict was legally unsupportable because there can be no failure to prevent discrimination and retaliation when there is no underlying discrimination; (2) there was no basis for the verdict in favor of Coronado on her whistleblower claim under Labor Code section 1102.5; and (3) there was no basis for the jury's award of punitive damages against Sweet Fish.

11

Respondents opposed on July 9, 2024, arguing: (1) Sweet Fish's JNOV motion should be denied because Sweet Fish had failed to provide certified copies of the transcript in support of its motion, as required by section 273, subdivision (b); (2) substantial evidence supported the claims found in favor of respondents; and (3) respondents were entitled to punitive damages.

On July 15, 2024, Sweet Fish filed a reply, briefly addressing the three arguments made in its opening brief.

The trial court did not hold a hearing or issue a ruling within the 75-day statutory period following service of the notice of entry of judgment. As a result, the JNOV motion was denied by operation of law pursuant to sections 629, subdivision (b) and 660, subdivision (c).

**Appeal**

On October 17, 2024, Sweet Fish filed a notice of appeal from the judgment and the denial of the JNOV motion by operation of law. Respondents filed a motion to dismiss the appeal on the ground that the appeal was untimely. Sweet Fish opposed the motion. On December 4, 2024, this court granted respondents' motion in part, limiting the appeal to the trial court's denial of Sweet Fish's JNOV motion.

## DISCUSSION

### I. Applicable law and standard of review

Section 629 allows the trial court to grant a JNOV motion "whenever a motion for a directed verdict for the aggrieved party should have been granted had a previous motion been made." (§ 629, subd. (a).) The motion must be made within the time limits set forth in section 659, governing motions for new trial. (§§ 629, subd. (b), 659, subd. (a).) "The power of the court to rule on a [JNOV motion] shall not extend beyond the last date upon which it has the power to rule on a motion for a new trial. If a [JNOV motion] is not determined before that date, the effect shall

12

be a denial of that motion without further order of the court."
(§ 629, subd. (b).)

"""A [JNOV motion] may be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence in support. [Citation.] … As in the trial court, the standard of review [on appeal] is whether any substantial evidence— contradicted or uncontradicted—supports the jury's conclusion.""" (*Webb v. Special Electric Co., Inc.* (2016) 63 Cal.4th 167, 192 (*Webb*).) """If there is any substantial evidence, or reasonable inference to be drawn therefrom in support of the verdict, the motion should be denied.""" (*Wright v. City of Los Angeles* (1990) 219 Cal.App.3d 318, 343 (*Wright*).)

When "the appeal challenging the denial of the [JNOV motion] raises purely legal questions, however, [the] review is de novo." (*Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1138.)

## II.     Failure to prevent discrimination and retaliation

The jury found Sweet Fish did not take adverse action against any of the respondents based on their race, color, association with a protected member of a protected class, and/or engagement in protected activity.

However, in response to the question, "Did [Sweet Fish] fail to take all reasonable steps to prevent discrimination and/or retaliation?" the jury answered "Yes." Sweet Fish and respondents claim the result is an inconsistent jury verdict, as a required element of failure to prevent discrimination or retaliation is an underlying finding that respondents "were subjected to discrimination or retaliation in the course of employment." The jury was so instructed. (See, e.g., *Trujillo v. North County Transit Dist.* (1998) 63 Cal.App.4th 280, 289 (*Trujillo*) ["'[T]here's no logic that says an employee who has not been discriminated against can sue an employer for not preventing discrimination that didn't happen.'"].)

13

Our review of a special verdict to determine whether its findings are inconsistent is de novo. (*Zagami, Inc. v. James A. Crone, Inc.* (2008) 160 Cal.App.4th 1083, 1092.) The appellate court "will interpret the verdict if it is possible to give a correct interpretation." (*Id.* at p. 1091.) "If the verdict is merely ambiguous, a party's failure to request a correction or clarification of the verdict before the jury is discharged may amount to a waiver of the ambiguity or defect." (*Id.* at p. 1092, fn. 5.)

As set forth below, after review, we disagree that the jury verdict is inconsistent under the circumstances of this case.

### A.     *No inconsistent verdict*

First, in questions one through 16, the jury found the adverse employment actions suffered by Cepeda, Coronado, and Tillman were not substantially motivated by those individuals' race, color, association with a protected member of a protected class, and/or engagement in protected activity. Questions one through 16 did not mention the word retaliation.[5]

The jury was separately instructed on the essential factual elements of retaliation, as follows:

---

[5]     The parties have not provided a citation to the record showing a jury instruction explaining the term "protected activity." Thus, it is not clear the jury understood the term "protected act" to include verbal opposition to perceived discrimination or a perceived violation of the law. Our analysis of the jury's further responses in the jury form, combined with our review of the jury instructions, show the jury did, in fact, believe Coronado and Cepeda had suffered retaliation for opposing what they perceived as illegal discrimination, even though the jury did not believe such discrimination occurred.

14

"Instruction

"No. 2505—Leny Cepeda and Lizette Corondo

"**Retaliation—Essential Factual Elements (Gov. Code, § 12940(h))**

" _____

"Leny Cepeda and Lizette Coronado claim that Sweet Fish Sushi Bar, Inc., retaliated against them based on race, color, association with a protected member of a protected class, and for opposing discrimination of another employee based on race and color. To establish this claim, Leny Cepeda and Lizette Coronado must prove all of the following:

"1. That Leny Cepeda and Lizette Coronado complained about and protested Sweet Fish Sushi Bar, Inc.'s discriminatory and retaliatory conduct;

"2. That Sweet Fish Sushi Bar, Inc., subjected Leny Cepeda, and Lizette Coronado to an adverse employment action;

"3. That Leny Cepeda and Lizette Coronado's race, color, association with a protected member of a protected class, or *opposition to discrimination* was a substantial motivating reason for Sweet Fish Sushi Bar, Inc.'s adverse employment action as to Leny Cepeda and Lizette Coronado,[6]

_____

**6** The italicized language used in the retaliation instruction differed in a significant way from the wording of questions one through 16 of the special verdict form. Questions one through 16 of the special verdict form asked the jury whether respondents' "race, color, association with a protected member of a protected class, and/or *engagement in a protected activity*" was the reason for the adverse employment actions they suffered. In contrast, the retaliation instruction asked instead whether respondents' "race, color, association with a protected member of a protected class, or *opposition to discrimination* was a substantial motivating reason for [Sweet Fish's] adverse employment action[s]" against Cepeda and Coronado. Thus, the jury could

15

"4. That Leny Cepeda and Lizette Coronado were harmed; and

"5. That Sweet Fish Sushi Bar, Inc.'s adverse employment action against Leny Cepeda and Lizette Coronado was a substantial factor in causing them harm. "Leny Cepeda, and Lizette Coronado do not have to prove discrimination in order to be protected from retaliation. If they reasonably believed that Sweet Fish Sushi, Inc.'s conduct was unlawful, they may prevail on a retaliation claim even if they do not present, or prevail on, a separate claim for discrimination." (Italics added.)

Although the parties were instructed on the elements of retaliation, and instructed that both Cepeda and Coronado were claiming retaliation, the term retaliation was not mentioned in the special verdict form until the jury reached the failure to prevent claim. At that time, the word "retaliation" is first mentioned with the question, "Did Sweet Fish Sushi Bar, Inc. fail to take all reasonable steps to prevent discrimination and/or retaliation?" The jury answered, "Yes."

Thus, while the jury found in the first 16 questions that Sweet Fish had not discriminated against Cepeda, Coronado, or Tillman, the jury found Sweet Fish failed to prevent either discrimination or retaliation. These two wrongs are written in the alternative—allowing the jury to find Sweet Fish failed to prevent either discrimination *or* retaliation. It is apparent the jury found Sweet Fish did not discriminate but did retaliate for Cepeda's and Coronado's acts opposing perceived—not actual— discrimination. The above-quoted instruction made it clear the

---

reasonably have answered the first series of questions in the negative but still answered affirmatively to the more specific question of whether Cepeda's and Coronado's *opposition to discrimination* was the basis for retaliation on the part of Sweet Fish.

jury did not need to find that Sweet Fish had discriminated in order to find that it had retaliated.

Significantly, the jury was asked whether Sweet Fish's "failure to prevent discrimination and/or retaliation" was a substantial factor in causing harm to Cepeda, Coronado, and Tillman. The jury specifically found the failure to prevent retaliation only damaged Cepeda and Coronado—not Tillman. That the harm only occurred against Cepeda and Coronado supports our interpretation of the jury verdict, as only Cepeda and Coronado expressed opposition to what they perceived as discrimination.

Thus, a close reading of the jury form reveals no inconsistency. While the jury found Sweet Fish did not discriminate against Cepeda, Coronado, or Tillman, it did find that Sweet Fish failed to prevent retaliation against Cepeda and Coronado.[7]

This reading of the special verdict form is consistent with the jury's later finding that Coronado suffered an adverse employment action as a result of her disclosure of discrimination. Specifically, as to the Labor Code section 1102.5 whistleblower claim, the jury found (1) Sweet Fish was Coronado's employer; (2) Coronado disclosed to a person with authority over her that

---

[7] The jury also found that Cepeda's discharge was not related to his "race, color, association with a protected member of a protected class, and/or engagement in protected activity," and Tillman's discharge was not related to his "race, color, gender, association with a protected member of a protected class, and/or engagement in protected activity." Again, this instruction did not use the words "retaliation" or "opposition to discrimination." The jury could reasonably have found that while Cepeda's discharge was not discriminatory, it was retaliatory. Alternatively, the jury could reasonably have found that Cepeda's discharge was not discriminatory or retaliatory but other actions, such as giving him fewer shifts, and blocking him from working with Coronado, were retaliatory.

Sweet Fish discriminated against another individual; (3) Coronado had reasonable cause to believe that the information disclosed a violation of a state or federal statute; (4) Sweet Fish subjected Coronado to an adverse employment action; (5) Coronado's communication was a contributing factor in Sweet Fish's decision to subject her to the adverse employment action; and (6) Sweet Fish's conduct was a substantial factor in causing harm to Coronado.[8]

In other words, Coronado was retaliated against due to her protests regarding the firing of Tillman. Although the firing of Tillman was not discriminatory, that was not required for Coronado to suffer retaliation, as the instruction specified Cepeda and Coronado did "not have to prove discrimination in order to be protected from retaliation." The jury's findings on the failure to prevent retaliation claim are consistent with its findings on the whistleblower claim.

The present matter is distinguishable from the case law cited by the parties disallowing inconsistent verdicts. In *Trujillo, supra*, 63 Cal.App.4th 280, the plaintiffs sued their employer alleging harassing and discriminatory conduct. The jury returned a special verdict "finding defendants had committed no discriminatory, racially harassing, or retaliatory conduct." (*Id.* at p. 283.) Under those circumstances, the jury's finding that the employer failed to take all reasonable steps necessary to prevent discrimination and harassment could not stand. In this case, the first 16 questions on the special verdict form did not clearly eliminate a finding of retaliatory conduct, and the jury was never specifically asked whether Cepeda and Coronado suffered retaliation. Reading the special verdict form as a whole, it is apparent the jury found Sweet Fish retaliated against Cepeda and Coronado.

---

[8]     The special verdict form did not ask the jury these whistleblower questions as to Cepeda.

18

*Dickson v. Burke Williams, Inc.* (2015) 234 Cal.App.4th 1307, 1309, involved a plaintiff who sued her employer alleging she was subjected to harassing and discriminatory conduct by two customers. Pursuant to the special verdict form, the jury found the plaintiff was "'subjected to unwanted harassing conduct' because of her sex and race but that such conduct was not 'severe or pervasive.'" (*Id.* at p. 1311.) Although the jury found the employer not liable for sexual harassment or sex discrimination due to the conduct being insufficiently severe and pervasive, it nevertheless found defendant liable on plaintiff's claim for failure to take reasonable steps necessary to prevent sexual harassment or sex discrimination. The question on appeal was whether the harassment at issue, which was not actionable due to its lack of sufficient severity and pervasiveness, could support the jury's finding of failure to take reasonable steps to prevent harassment. (*Id.* at pp. 1313–1317.) The *Dickson* court concluded there could be no liability for failure to prevent where there was no *actionable* sexual harassment or discrimination.

Here, there was actionable retaliation, as shown by the jury's responses to the questions regarding failure to prevent retaliation and Coronado's whistleblower claim. The jury's findings that Sweet Fish failed to prevent retaliation against Cepeda and Coronado reveal no inconsistency, read in the context of the entire special verdict form.

However, as set forth below, even if error occurred, such error was invited by the parties, who affirmatively approved the special verdict form.

## B.    *Invited error and forfeiture*
### 1.    *The flawed special verdict form*

The questions on the special verdict form in Phase I relevant to failure to prevent discrimination or retaliation did not track the jury instructions on this claim. Specifically, the jury instructions specified the following elements: "1. That Leny Cepeda, Lizette Coronado and/or Marcel[] Tillman were

19

employees of Sweet Fish Sushi Bar, Inc.; [¶] 2. *That Leny Cepeda, Lizette Coronado and/or Marcel*[] *Tillman were subjected to discrimination or retaliation in the course of employment*; [¶] 3. That Sweet Fish Sushi Bar, Inc. failed to take all reasonable steps to prevent the discrimination or retaliation; [¶] 4. That Leny Cepeda, Lizette Coronado and/or Marcel[] Tillman were harmed; and [¶] [5.] That Sweet Fish Sushi Bar, Inc.'s failure to take all reasonable steps to prevent discrimination or retaliation was a substantial factor in causing Leny Cepeda, Lizette Coronado and/or Marcel[] Tillman's harm." (Italics added.) Thus, in the second prong, the instruction specified there must be an underlying finding that one or more of the three respondents was subjected to discrimination or retaliation.

Within the questions on failure to prevent retaliation, the special verdict form did not allow the jury to specify that Cepeda, Coronado or Tillman was subjected to retaliation. Instead, the special verdict form asked: "Did Sweet Fish Sushi Bar, Inc. fail to take all reasonable steps to prevent discrimination and/or retaliation?" The jury answered this question in the affirmative.

As set forth above, this was the first time the special verdict form mentioned the word "retaliation," requiring an implicit finding that the jury found underlying retaliation.[9] The questions regarding failure to prevent went on to ask whether the failure to prevent such "discrimination and/or retaliation" was a

---

[9] As explained above, with previous answers, the jury found that the plaintiffs' "race, sex, association with a protected member of a protected class, and/or engagement in protected activity" was not a substantial motivating factor in Sweet Fish's adverse employment actions. However, the jury was never specifically asked whether any of the plaintiffs suffered retaliation for *opposing perceived discrimination*. Given the jury's answers to the questions regarding failure to prevent discrimination or retaliation, we must assume the jury's answers to the earlier questions did *not* include their findings on the issue of retaliation for opposition to perceived discrimination.

substantial factor in causing harm to Cepeda, Coronado, and Tillman. The jury answered affirmatively as to Cepeda and Coronado but answered in the negative as to Tillman.

The special verdict form was flawed in that it did not give the jury the opportunity to make a finding of underlying retaliation, as that term was described in the jury instructions.[10] The jury's answers to these questions on failure to prevent require an affirmative answer to the unasked question of whether any of the plaintiffs suffered retaliation for opposition to discrimination while employed at Sweet Fish.

### 2. *Invited error*

Sweet Fish and respondents jointly approved the flawed special verdict form. The record shows when Sweet Fish's counsel voiced objections to the special verdict form, the court allowed the parties time to "sit right here, fix the jury form, and you can email it to me or email it to Madam Clerk in Word format." The court warned both parties to "figure out how to fix it. And please triple-check it in terms of accuracy." Following a recess during which the parties reviewed and modified the special verdict form, the trial court stated, "So now I have a special verdict form with handwriting on this, and I'll put on the cover Phase I.… So this is—it appears to be joint.… [¶] Have you all looked over this carefully and checked every decision tree, checked every number to ensure that this is accurate and what everyone wants?" Counsel for both Sweet Fish and respondents answered affirmatively.

"The 'doctrine of invited error' is an 'application of the estoppel principle': 'Where a party by his conduct induces the commission of error, he is estopped from asserting it as a ground

---

[10] As set forth above, the jury instructions defined retaliation as arising from, among other things, "opposition to discrimination." The jury was never asked whether respondents' opposition to discrimination resulted in adverse employment actions.

21

for reversal' on appeal." (*Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 403.) The doctrine rests on the principle that a party may not mislead the trial court and then "profit[] therefrom in the appellate court." (*Ibid.*)

Here, the parties misled the trial court into believing they had "checked every decision tree" to ensure the special verdict form was accurate and precise. In fact, the form was missing a key foundational question about plaintiffs' failure to prevent retaliation claim. Under the doctrine of invited error, the parties are estopped from profiting from their own error. The jury did nothing wrong.

### 3. *Forfeiture*

Further, because both parties failed to object to the purported inconsistent verdict prior to the time the jury was dismissed, the claim of error is forfeited. "'*Failure to object to a verdict before the discharge of a jury and to request clarification or further deliberation precludes a party from later questioning the validity of that verdict if the alleged defect was apparent at the time the verdict was rendered and could have been corrected.*'" (*Keener v. Jeld-Wen, Inc.* (2009) 46 Cal.4th 247, 263–264 (*Keener*).)[11] "'The obvious purpose for requiring an objection to a defective verdict before the jury is discharged is to provide it an opportunity to cure the defect by further deliberation.'" (*Id.* at p. 264, fn. 21.) The purported inconsistency in the verdict of which appellants now complain was apparent at the time the jury rendered its verdict. Had appellants objected, the jury would have had the opportunity to clarify its verdict or deliberate further. Because appellants failed to object, their claim is forfeited. (*Id.* at pp. 263–264.)

---

[11] Appellants' argument that they properly preserved the challenge to the jury verdict by filing a timely JNOV motion is not well taken in light of the requirement that objections to a jury verdict must be made before the jury is discharged. (*Keener, supra,* 46 Cal.4th at pp. 263–264.)

## III. Coronado's retaliation claim under Labor Code section 1102.5

Sweet Fish next argues Coronado's retaliation claim under Labor Code section 1102.5 is unsupported by substantial evidence. Specifically, Sweet Fish argues Coronado testified her reduction in hours and eventual separation from employment were due to her cumulative trauma injury and subsequent full disability leave—not in retaliation for any protected disclosure. For the reasons set forth below, we disagree.

### A. *Applicable law and standard of review*

To prevail under Labor Code section 1102.5, a plaintiff must show (1) that she engaged in a protected disclosure; (2) that she suffered an adverse employment action; and (3) that there was a causal connection between the two. (*Akers v. County of San Diego* (2002) 95 Cal.App.4th 1441, 1453.) Sweet Fish disputes the third element, causation.

The standard of review is whether any substantial evidence, contradicted or uncontradicted, supports the jury's conclusion. (*Webb, supra,* 63 Cal.4th at p. 192.) ""If there is any substantial evidence, or reasonable inference to be drawn therefrom in support of the verdict,"" we must affirm the verdict. (*Wright, supra*, 219 Cal.App.3d at p. 343.)

### B. *Substantial evidence supports the jury's verdict*

The relevant jury instruction provided:

"Lizette Coronado claims that Sweet Fish Sushi, Inc. reduced her work hours in retaliation for her oral complaint to Sweet Fish Sushi, Inc. about its discriminatory practices. In order to establish this claim, Lizette Coronado must prove all of the following:

"1. That Sweet Fish Sushi, Inc. was Lizette Coronado's employer;

"2. That Lizette Coronado disclosed to a person with authority over Lizette Coronado that Sweet Fish Sushi, Inc. discriminated upon other individuals;

23

"3.  That Lizette Coronado had reasonable cause to believe that the information disclosed a violation of a state statute;

"4.  That Sweet Fish Sushi, Inc. subjected Lizette Coronado to an adverse employment action;

"5.  That Lizette Coronado's disclosure of information was a contributing factor [to] Sweet Fish Sushi, Inc.'s decision to subject Lizette Coronado to an adverse employment action;

"6.  That Lizette Coronado was harmed; and

"7.  That Sweet Fish Sushi, Inc.'s conduct was a substantial factor in causing Lizette Coronado's harm."

In questions 34 through 39 on the special verdict form, the jury found in favor of Coronado on each of these elements.

Sweet Fish points to evidence that Coronado testified she suffered a cumulative injury spanning from April 2016 through December 2017.  She admitted her work hours decreased as her injury worsened, until she was eventually placed on full disability.  Coronado never disclosed this injury to her coworkers or managers.

There was, however, also evidence in the record that Coronado's hours were reduced against her will.  Coronado testified her shifts changed dramatically after the June 2017 incident in which she questioned the motives for Tillman's firing.  She testified before June 2017, she worked both server shifts, where she would receive tips, and closing supervisor shifts.  However, after June 2017, she primarily received only closing supervisor shifts, during which she was not able to receive tips.  Coronado testified she had been working full-time during the week but was cut down to one lunch shift during the week.  Coronado also testified she complained verbally and via text to Soriano about her server shifts being cut, but he would brush her off, saying he was not the one making the rules.

Further, a few weeks after the incident with Tillman, Sweet Fish management made a rule that Coronado and Cepeda could not work together. Coronado was later suspended for two weeks for working a shift with Cepeda during Soriano's absence from the workplace, despite Soriano's assurances that it was fine. Coronado testified it felt like a "setup."

As respondents observe, Coronado testified she did not set her own hours and her hours were reduced against her will. Because Sweet Fish was unaware of her disability, the jury was justified in declining to consider her disability as the reason Sweet Fish reduced her hours, blocked her from working with Cepeda, and suspended her.

Substantial evidence, in the form of Coronado's testimony, described above, supported the jury's verdict on Coronado's whistleblower retaliation claim under Labor Code section 1102.5.

## IV. Punitive damages awards

Sweet Fish claims the jury's punitive damages awards in favor of Cepeda and Coronado must be reversed because respondents failed to present clear and convincing evidence of "oppression, fraud, or malice" by Sweet Fish, as required by Civil Code section 3294, subdivision (a).

### A. *Applicable law*

"The civil law is normally concerned with compensating victims for actual injuries sustained at the hands of a tortfeasor. Punitive damages are an exception to this rule." (*College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 712.) Punitive damages are authorized when the tortious event involves an "additional egregious component—'oppression, fraud, or malice.'" (*Ibid.*) These terms are defined in the statute as follows: "(1) 'Malice' means conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others. [¶] (2) 'Oppression' means despicable conduct that subjects a person to cruel and

25

unjust hardship in conscious disregard of that person's rights. [¶] (3) 'Fraud' means an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury." (Civ. Code, § 3294, subd. (c).)

The jury's determination that Sweet Fish acted with malice, oppression or fraud is reviewed for substantial evidence. (*Soto v. BorgWarner Morse TEC Inc.* (2015) 239 Cal.App.4th 165, 195.)

## B.     *Substantial evidence supports the punitive damages awards*

As explained above, the jury implicitly found—given the flawed special verdict form—that Sweet Fish retaliated against both Cepeda and Coronado for their expressions of opposition to what they perceived as racial discrimination against Tillman.

There was testimony that both Cepeda's and Coronado's shifts were cut against their wishes. There was further testimony that Watson ordered Cepeda and Coronado, who were a couple that commuted to work together, to no longer work the same shift. Watson provided conflicting testimony as to whether his decision to separate Cepeda and Coronado was related to their work performance. The jury could have viewed both the cutting of work shifts and the rule forbidding them from working together as malicious conduct designed to intentionally hurt them.

Further, although he knew Watson had ordered Cepeda and Coronado to work separate shifts, there was evidence Soriano scheduled them to work together while he was on vacation and expressly told Coronado it was fine. Yet Coronado was suspended for two weeks. The jury could have believed Soriano set up the violation, knowing Coronado would be punished. Soriano took no responsibility for the violation. The

26

jury could reasonably have found Soriano's actions to be fraudulent and malicious.

The jury was entitled to disbelieve Watson when he said he did not know the reason for Coronado's suspension. The jury was also entitled to disbelieve Sweet Fish management's testimony that Cepeda's and Coronado's work reductions were due to Cepeda and Coronado sending other workers home.

Both Cepeda and Coronado testified they suffered reduced work shifts and server shifts following their protected disclosures. They were barred from working together, then Coronado was punished for doing so after having been expressly told to work the shift. Cepeda was punished for missing a manager's meeting despite receiving permission to do so. He was then excluded from a manager's meeting and ultimately discharged. The jury could reasonably have concluded Sweet Fish was undertaking a campaign of retaliation against Cepeda and Coronado for accusing Sweet Fish management of racial discrimination.[12]

---

[12] Sweet Fish argues respondents failed to establish a managing agent was responsible for the retaliation, as there was no evidence Watson personally engaged in any wrongful conduct with the required mental state. The jury was not required to believe Watson's efforts to distance himself from the events at issue. On several occasions, Soriano informed respondents the decisions were coming from above. Even if the jury believed Soriano to be the responsible party, Soriano was the general manager of Sweet Fish at the time of the events in question. In ruling on an evidentiary objection, the trial court noted, "I do find based on the evidence presented as general manager of Sweet Fish, [Soriano] is an agent of the parties. He meets the definition. He made decisions about the company." Thus, even if the jury believed Watson was uninvolved, the jury could properly find Soriano was a managing agent of Sweet Fish. (Civ. Code, § 3294, subd. (b) [act of malice, oppression or fraud must be carried out by "officer, director, or managing agent of the corporation."].)

**DISPOSITION**

The order is affirmed.  Respondents are awarded their costs of appeal.


CHAVEZ, Acting P. J.


We concur:


RICHARDSON, J.


GOORVITCH, J.